UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| ANTHONY AARON, Plaintiff, v. ANDREW M. SAUL, Defendant. | Case No. 18-cv-03672-JCS<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT, REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 15, 20 |
|---|---|

## I. INTRODUCTION

Plaintiff Anthony Aaron seeks review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner"), denying his applications for disability insurance benefits and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, REVERSES the decision of the Commissioner and REMANDS the case to the Social Security Administration for further proceedings.[1]

## II. BACKGROUND

### A. The Five-Step Evaluation Process

In order to be found "disabled" under the Social Security Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C § 636(c).

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). In addition, in order to be entitled to disability benefits under Title II, a claimant must establish that he was disabled on or before his date last insured. *See Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998); *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At Step One, the Administrative Law Judge ("ALJ") considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If he is, the ALJ must find that he is not disabled. *Id.* If he is not engaged in substantial gainful activity, the ALJ continues the analysis. *See id.*

At Step Two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the regulations' twelve-month duration requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

At Step Three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, he is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At Step Four, the ALJ considers the claimant's residual functional capacity (RFC) in light of his impairments and whether he can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)). If he can perform past relevant work, he is not disabled. *Id.* If he cannot perform past relevant work, the ALJ proceeds to the final step. *See id.*

At Step Five, the burden shifts to the Commissioner to demonstrate that the claimant, in light of his impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1520(a)(4)(v). If the Commissioner meets this burden, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that he can perform. *Id.*

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process. *See generally* 20 C.F.R. § 404.1520a. First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(b)(2), (c). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to step four of the general disability inquiry.[2] *See* 20 C.F.R. § 404.1520a(d)(3).

---

[2] Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

3

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments. . . ." Social Security Ruling 96-8p, 1996 WL 374184, at *4.

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)) (quotation marks omitted). Substantial evidence must be based on the record as a whole and is "such relevant evidence as a reasonable mind might accept as adequate to support a

---

criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which require that the claimant suffers at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

4

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "must be 'more than a mere scintilla,' but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). Even if the Commissioner's findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

**B. Factual Background**

Plaintiff was 54 years old at the time of his administrative hearing and had a 12th grade education. AR 46. He tested at the 8.7 grade level equivalent on the Test of Adult Basic Education. AR 587. Plaintiff reports he experienced both physical and sexual abuse as a child. AR 586. Plaintiff does not have any past relevant work. AR 46.

In November 2004, Plaintiff was found not competent to stand trial and was admitted for psychiatric treatment at Napa State Hospital, where he remained until July 26, 2006, when he was found competent to stand trial and discharged to Alameda County Jail. AR 651. From 2007 to 2013, Plaintiff was incarcerated and received psychiatric treatment in the California state prison system. AR 492-659. When Plaintiff was incarcerated, in 2007, he was evaluated and found to meet the criteria for inclusion in the mental health treatment program in prison based on diagnoses of Psychotic Disorder NOS, Depressive Disorder, and mental retardation. AR 495. It was noted that Plaintiff "report[ed] continued depression," had a history of suicide attempts, and "admit[ted] to auditory hallucinations." *Id.*

During his incarceration, treatment providers, including psychiatrists P. Pacifico, M.D., P. Shamasundara, M.D., and K. Kumar, M.D., diagnosed Plaintiff with "schizophrenia disorder," "schizoaffective disorder" and "schizophrenia paranoid." AR 431, 447, 454510, 511, 512, 516. Prison records also contain numerous references to symptoms of psychosis – for which Plaintiff was prescribed Risperdal – and depression – for which Plaintiff was prescribed Paxil. AR 428, 436-437, 447, 454, 487, 490, 512-516, 525. Prison treatment records are also replete with reports that Plaintiff experienced auditory hallucinations. *See, e.g.,* AR 429 ("voices and other symptoms

5

are manageable"), 431 ("reports still hear[ing] voices"), 432 ("voices are stable"), 454 ("when he wakes up the voices take over"), 511 ("the voices are always there especially when mind is not preoccupied").

Upon release from prison in 2013, Plaintiff began receiving psychiatric treatment with Gregory Girtman, PsyD, of the Parole Outpatient Clinic, and Erica Conners, PhD, of the Sharper Future program. AR 578, 663; *see also* AR 75-76, 577-590, 660-751. He saw Dr. Girtman monthly and Dr. Conners weekly. AR 577-590, 660-751. Dr. Girtman diagnosed Plaintiff with schizoaffective disorder. AR 585. He noted that Plaintiff "still experiences auditory hallucinations and feelings of paranoia." AR 587. In a Function Report-Adult-Third Party completed on October 3, 2013, Dr. Girtman reported that Plaintiff had poor sleep, required reminders to take his medication and attend appointments, had difficulty getting along with others, had an extremely limited attention span (less than 5 minutes), did not finish what he started, had difficulty following instructions, and exhibited paranoia around people. AR 373-74, 376-78. He further noted that Plaintiff handled stress and changes to his routine poorly. AR 378.

Dr. Conners supplied treatment notes for her weekly sessions with Plaintiff, all of which used the same standardized template carrying the header "Progress Notes: Oakland – HRSO State Parole." AR 663-751. The form did not include a subheading or check-box area to list the patient's diagnosis and none was listed on these treatment notes, but the notes describe symptoms of hallucinations, high distractibility, mood elevations, decline in basic functioning when stressed, anxiety, fear of people, and inattentiveness. *Id*. In an October 7, 2015 letter submitted to the Social Security Administration in support of Plaintiff's disability application, Dr. Conners wrote that these symptoms would "impair [Plaintiff's] ability to engage in basic activities without individualized support" and that "[d]espite being consistent with his medication regimen he experiences a significant decline in basic functioning that results in crying spells, cognitive distortions and at times passive suicidal ideation." AR 660. She further opined that "[b]ased on these challenges it would be very difficult for him to maintain employment and support himself financially if he is reliant on his ability through a work day." *Id*.

In addition, the record contains a form that Dr. Conners completed for Plaintiff in order

to receive accommodations at community college, dated August 26, 2014. AR 86. In that form, Dr. Conners wrote under "description of disability" "auditory hallucinations, high distractability, paranoia." *Id*. She listed Plaintiff's diagnosis as DSM IV code as 295.4, which corresponds to schizophreniform disorder. *See Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed. Text Revision ("DSM-IV-TR") at pp. 317-318. She described the impact of Plaintiff's condition on his ability to function in an academic setting as follows: "Client requires a very structured setting, tutorial support and positive reinforcement to support his desire to learn. Extremely crowded rooms and having minimal support in the classroom cause him to be agitated and highly distracted." *Id*. She further wrote that Plaintiff's medications "sometimes make him sleepy." *Id*.

Also beginning in 2013, Plaintiff received general medical treatment and psychiatric medications from Save a Life Wellness Center. AR 594-616. Treatment providers there observed that Plaintiff suffered from anxiety and psychosis and reported that he was hearing voices and feeling anxious. AR 595. Over the course of his treatment at Save a Life Wellness Center, Plaintiff was prescribed Risperidone, Paxil, and Vistiral for his psychiatric symptoms. AR 594, 596, 599-605. He was repeatedly noted to carry a diagnosis of Schizophrenia. AR 594, 597, 603-07. He was also sometimes noted to have diagnoses of Anxiety (AR 594-95, 605-07) and Depression (AR 596).

In July and October 2013, non-examining State agency medical consultants Barry Rudnick, M.D. and L. Colsky, M.D. provided medical opinions to the Social Security Administration based on review of Plaintiff's record. AR 87-98, 109-20. Both found Plaintiff to have a primary impairment of "Schizophrenic, Paranoid and Other Functional Psychotic Disorders," which they found to be "severe." AR 92, 115. Drs. Rudnick and Colsky also both opined that Plaintiff was limited to unskilled work and would have moderate impairments in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting. AR 95-97, 117-19.

Plaintiff has a history of substance use but the record shows no substance induced

1 diagnoses and drug and alcohol abuse ("DAA") was not found to be an issue in his case. AR 97, 105, 119.

C.  **Procedural History**

Plaintiff filed a claim for disability insurance and SSI benefits on April 3, 2013, with an alleged onset date of January 1, 2002. Administrative Record ("AR") 269-77. He alleges that he is disabled on the basis of paranoid schizophrenia. *Id*. at 132-345.[3] The claims were denied initially on July 25, 2013 and upon reconsideration on November 8, 2013. Plaintiff then filed a written request for a hearing before an administrative law judge ("ALJ"). AR 38. A hearing was held before ALJ Richard Laverdure on May 13, 2015 and was continued to develop the record. AR 54-63. Another hearing was held on September 30, 2015, at which Plaintiff appeared and testified. AR 64-85. Vocational Expert ("VE") Joel Greenberg also appeared at the hearing but offered no testimony. *Id*. ALJ Laverdure issued an unfavorable decision on November 12, 2015 finding Plaintiff was not disabled. AR 35-53. Plaintiff filed a request for review of that decision to the Appeals Council and that request was denied on March 3, 2018. AR 1-7. On June 20, 2018, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

D.  **The ALJ's Decision**

The ALJ applied the five-step analysis discussed above to determine whether Plaintiff qualified for benefits under Titles II or VI. At Step One, he found that Plaintiff has not engaged in substantial gainful activity since his alleged onset date of January 1, 2002. AR 40.

At Step Two, the ALJ found that Plaintiff's date last insured ("DLI") is June 30, 2004. AR 133. He concluded that as of that date Plaintiff had no severe impairments and therefore was not eligible for benefits under Title II. AR 41. The ALJ relied on medical records from Napa State

---

[3] According to the Commissioner, Plaintiff's original application is not in the administrative record. *See* Commissioner's Motion for Summary Judgment at 1 n. 1. An undated Disability Report that summarizes Plaintiff's application lists paranoid schizophrenia, bipolar disorder and post-traumatic stress disorder as the conditions that render him disabled. AR 345. However, a document that appears to have been completed by the Social Security Administration at the reconsideration stage lists only "Schizophrenic, Paranoid & Other Functnl, Psychotc. Dsrd" as Plaintiff's primary diagnosis. In Plaintiff's Motion for Summary Judgment, he addresses only the diagnosis of schizophrenia as the basis for claims for disability benefits and SSI.

8

Hospital, where Plaintiff was admitted on November 9, 2004 after being found incompetent to stand trial. AR 41, 651-652. He was released approximately one and a half years later when he was found competent. AR 651.

With respect to Plaintiff's claim for SSI benefits under Title XVI, the ALJ found at Step Two that Plaintiff had the following severe impairments: depression, anxiety, and polysubstance dependence in uncertain remission. AR 42. The ALJ noted that Plaintiff also claimed to be disabled due to paranoid schizophrenia, bipolar disorder and post-traumatic stress disorder but that there did "not appear to be any actual independent diagnosis of any of these disorders in the record." *Id*. He states further, "[w]hile 'psychotic disorder' and schizophrenia appear in the claimant's mental history in Exhibit 12F, there is no evidence that that is based on any provider's independent evaluation; rather it appears to be based on the claimant's self-report." *Id*.

At Step Three, the ALJ applied the special rules that apply to mental impairments and found that none of Aaron's impairments, alone or in combination, met or equaled a Listing. *Id*. He states that he considered Listings 12.03, 12.04, 12.06 and 12.09. In reaching this conclusion, the ALJ found that Plaintiff had mild restrictions in activities of daily living, citing evidence that Plaintiff has "no problems with personal care," "uses public transportation," "attends community college" and "attends church regularly." *Id*. The ALJ found that Plaintiff has moderate difficulties with social functioning, relying on evidence that Plaintiff is "able to shop in stores and takes public transportation," that he "volunteered with the homeless, attends community college classes and attends church regularly." AR 43. The ALJ found that Plaintiff has mild difficulties with concentration, persistence and pace, again noting that Plaintiff "is able to take public transportation and shop[,] . . . attends community college classes . . . [and] is independent in personal care." *Id*. The ALJ also found that Plaintiff had experienced no episodes of decompensation each of extended duration. *Id*.

At Step Four, the ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to performing non-public, simple, repetitive, tasks. *Id*. In support of this conclusion, the ALJ cited records from Napa State Hospital and treatment records from when Plaintiff was in

prison, from 2006 to 2013. *Id*. He rejected the opinions of Dr. Erica Connors, who treated Plaintiff starting in 2013, and of state agency doctors who reviewed the record (Dr. Barry Rudnick and Dr. L. Colsky). He did not address the opinions of psychologist Gregory Girtman, who also treated Plaintiff starting in October 2013.

Finally, at Step Five the ALJ relied on the Medical-Vocational Guidelines (the "Grids") to find that Plaintiff was not disabled. The ALJ noted that he used the Grids as a framework for determining disability in light of Plaintiff's nonexertional limitations, finding that the nonexertional limitations in Plaintiff's RFC "have little or no effect on the occupational base of unskilled work at all exertional levels." AR 47.

### E. Plaintiff's Contentions In His Summary Judgment Motion

Plaintiff contends the ALJ committed four errors. First, he contends the ALJ erred by failing to include schizophrenia as a severe impairment at Step Two on the basis that there is no evidence of an independent diagnosis of that disorder in the record. Plaintiff's Summary Judgment Motion at 6. According to Plaintiff, there are "repeated diagnoses of [s]chizophrenia in the record from several different providers since at least 2011, and it is the only diagnosis from Plaintiff's long-term treating providers Dr. Girtman and Dr. Connors." *Id*. Plaintiff further asserts that the record is replete with evidence that since at least 2011 Plaintiff has been prescribed psychotropic medications specifically for schizophrenia and psychosis and that he has exhibited ongoing symptoms of psychosis, "including auditory hallucinations, anxiety, social isolation, difficulty maintaining attention and concentration, depression, and an inability to handle stress or changes in routine." *Id*. Plaintiff further asserts that the ALJ's error is not harmless because these symptoms give rise to limitations that are not accounted for in his RFC and that significantly impact his ability to work. *Id*. at 7.

Second, Plaintiff asserts that the ALJ erred by failing to offer adequate reasons for rejecting the opinions of treating psychologist Erica Connors and ignoring (and implicitly rejecting) the opinions of treating psychologist Gregory Girtman with respect to their diagnosis of schizophrenia and their observations as to Plaintiff's symptoms associated with his schizophrenia. Plaintiff also argues that the ALJ was required to offer reasons for rejecting the opinions of two

10

state agency consultants, Dr. Barry Rudnick and Dr. L. Colsky, who reviewed the record and concluded that Plaintiff's schizophrenia is a severe condition. *Id*. at 3-4, 7-12.

Third, Plaintiff argues that as a consequence of these errors, the ALJ's RFC does not reflect his limitations associated with schizophrenia and is not supported by substantial evidence. *Id*. at 12-13.

Finally, Plaintiff argues that the ALJ erred in using the Grids as a framework to determine whether he is disabled because Plaintiff has significant nonexertional limitations – even under the ALJ's RFC but especially if the other limitations that were erroneously omitted are considered – that would significantly erode the occupational base of jobs Plaintiff could perform. *Id*. at 13-14. Therefore, Plaintiff argues, the ALJ was required to take testimony of a vocational expert about the jobs available to Plaintiff in light of these nonexertional limitations. *Id.* at14. Plaintiff argues that because the ALJ did not obtain such evidence his conclusion at Step Five is not supported by substantial evidence.

### III. ANALYSIS

#### A. The ALJ's Weighing of the Evidence

##### 1. Legal Standards

The Ninth Circuit differentiates among the opinions of three different types of physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The categories are as follows: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Id.* "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d at 830-831). An ALJ can satisfy the "substantial evidence" requirement by

11

"setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted). "Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them." *Marsh v. Colvin*, 792 F.3d 1170, 1172–73 (9th Cir. 2015). While harmless error analysis applies in the social security context, a failure to give adequate reasons for discounting the opinions of treating or examining physicians is only harmless if the reviewing court "'can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Id.* (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006)).

"If a treating provider's opinions are based 'to a large extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)). "However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Id.* (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008)). Moreover, where a treating provider evaluates mental impairments, clinical interview and mental status evaluation are "objective measures and cannot be discounted as a 'self-report.'" *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). As the Ninth Circuit explained in *Buck*:

> Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry.

*Id.* The court in *Buck* agreed with the D.C. Circuit and the Sixth Circuit that "'[t]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology. . . .'" *Id.* (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)

12

(quoting *Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C. Cir. 1987))).

"The Commissioner may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998).

### 2. Discussion

The ALJ rejected Dr. Conners' opinion that it would be "very difficult" for Plaintiff to maintain employment on the basis that it was "not supported by any objective evidence, specifically Dr. Conners' own treatment notes, which never identify a specific treating diagnosis and generally report that the claimant is doing well, is able to manage his parole requirements, and attends community college." AR 46. He also "accord[ed] little weight to the opinion of the State agency psychological consultants" because he did "not find that [Plaintiff] has a severe psychotic disorder" even though he did find that Plaintiff had mental impairments. *Id*. The ALJ dismissed references to Plaintiff's schizophrenia in prison treatment records on the basis that the diagnosis was based on self-reports. The ALJ did not address Dr. Gerritson's diagnosis or treatment notes at all. The Court finds that the ALJ erred in his evaluation of the medical evidence and that his rejection of the schizophrenia diagnosis that was adopted by numerous doctors and treatment providers is not supported by substantial evidence.

First, as discussed above, Plaintiff's prison treatment records reflect that several psychiatrists diagnosed him with schizophrenia, paranoid schizophrenia or psychotic disorder and during the eight years he was incarcerated he was prescribed medication to address his psychosis. The prison medical records also show that his treatment providers met with Plaintiff on a regular basis and made objective observations with respect to Plaintiff's mental impairment and symptoms. Yet the ALJ rejected the diagnosis of these doctors who had a longstanding treatment relationship with Plaintiff on the basis that there was not any "actual independent diagnosis," finding instead that Plaintiff's diagnosis was based on claimant's "self-report." *See* AR 42. ALJ Laverdure's conclusion appears to be based on a lack of understanding of the principles set forth by the Ninth Circuit in *Buck*, discussed above. As was made clear in that case, where a claimant has a mental impairment, objective evidence includes clinical interviews and mental status evaluations even if the evaluation of a mental impairment will always rely to some extent on the

13

patient's self-report. *Buck*, 869 F.3d at 1049. The prison medical records include extensive notes by clinicians who diagnosed Plaintiff with schizophrenia and who observed Plaintiff's symptoms (including auditory hallucinations and paranoia) in the course of treatment.

ALJ Laverdure also seemed to rely on notes by treatment providers at Napa State Hospital from 2004 suggesting that Plaintiff might have been malingering to avoid trial. Based on these observations, the ALJ concluded that Plaintiff was simply "fak[ing] a mental illness to avoid trial." AR 42. He offered no explanation, however, of why the observations from 2004 would be probative of Plaintiff's mental impairment in subsequent years, when he no longer had an incentive to malinger to avoid trial and yet still was observed by his treatment providers to show symptoms of psychosis, leading multiple doctors to diagnose Plaintiff with schizophrenia. Indeed, the persistence of the same or similar symptoms while Plaintiff was in prison casts serious doubt on the speculation of some clinicians at Napa State Hospital that Plaintiff was simply faking his symptoms to avoid trial. In short, the Court finds that the ALJ failed to offer specific and legitimate reasons supported by substantial evidence for rejecting outright the schizophrenia diagnosis of Plaintiff's treatment providers while in prison.

Similarly, the Court finds that ALJ Laverdure failed to offer specific and legitimate reasons supported by substantial evidence for rejecting the opinion of treating physician Dr. Conners. To the extent he relies on the fact that Dr. Conners' diagnosis was reflected in a form submitted in support of Plaintiff's request for special accommodation at community college but *not* in her weekly progress notes, the ALJ offers no explanation as to why the omission on the latter is probative of whether the diagnosis is correct. Given that the template that Dr. Conners consistently used to record her progress notes did not include a place to list the patient's diagnosis, the Court concludes that this omission is not probative of whether her diagnosis is supported by objective medical evidence.

Nor does the ALJ accurately characterize Dr. Conners' progress notes when he states that they do not support her diagnosis. These progress notes describe Dr. Conner's medical observations of Plaintiff's symptoms, including auditory hallucinations, high distractibility, decline in basic functioning during periods of stress, anxiety, fear of people, and inattentiveness. AR 663

14

("expressed his fear of people" "appeared very guarded" "eyes watered as he discussed his pain"), 664 ("high need to be supported" "fearful of people"), 666 ("session addressed the voices that he hears in his head"), 667 ("continues to report that he hears voices and they are more prevalent in the morning"), 669 ("triggers for anxiety were also discussed as it pertained to becoming anxious around strangers"), 673 ("explor[ed] strategies to assist him in managing his auditory hallucinations"), 677 (clinician noted that Plaintiff looked "harshly" at another client, which he explained was because of "the voices in his head"; Plaintiff "recognize[d] that his mental health symptoms make him vulnerable to having a decline in functioning when he gets anxious or is required to focus for an extended period of time"), 682 (Plaintiff "very anxious about the upcoming change in parole agent"; "seems to thrive with the routine and structure provided through the relationship with the current parole agent"; "clinician advised the client she would follow up with the agent to express his need to have as much consistency and to continue with the routine that is currently in place"), 684 (Plaintiff "is extremely distressed by the recent changes in his routine that resulted from the change in parole agents"; Plaintiff "will continue to be monitored for symptoms of increased decline in functioning"; Plaintiff "continues to experience auditory hallucinations as well"), 685 (Plaintiff "continues to become emotionally labile and experiences a decline in general functioning during periods of transition and distress"), 686 ("tearful at times"), 687 ("very agitated"; Plaintiff "continues to struggle with managing any change in his routine to the point where he frequently becomes emotionally unregulated and labile"), 689 ("Plaintiff hears voices that tell him to do violent things such as verbally lashing out at someone that he perceives as a threat" and "to hurt himself"), 693 ("Plaintiff was "emotionally labile", "very depressed", has "lost interest in some of his hobbies", "isolating from others"), 694 ("session explored triggers to his anxiety and increase in auditory hallucinations"), 708 ("still reports challenges with social interactions and tends to isolate himself"), 709 ("difficulty interacting with people when he is not in a structured environment"), 710 ("stressed and overwhelmed"; "seemed physically fatigued"), 729 ("seemed fatigued"; "continued to struggle with racing thoughts at night"; "continues to isolate himself and stated he would find school much more difficult if he was not taking classes . . . where he received significant individualized attention and support from staff"), 730 ("distressed"; "auditory hallucinations are becoming more pronounced and are of a more self-harm thematic nature") 737

(Plaintiff has a "tendency to make inaccurate conclusions or rash decisions when he is emotionally distraught"). As discussed above, such clinical observations of a patient constitute objective medical evidence in the context of mental health impairments.

The ALJ's reliance on the fact that Plaintiff attended community college also was not a specific and legitimate reason for rejecting Dr. Conners' opinions as he failed to address the accommodations afforded to Plaintiff at community college or explain why Plaintiff's attendance at community college with those accommodations was inconsistent with Dr. Conners' opinions regarding Plaintiff's limitations.

Accordingly, the Court finds that ALJ Laverdure did not provide specific and legitimate reasons supported by substantial evidence for rejecting Dr. Conners' opinions about Plaintiff's diagnosis and symptoms.

Dr. Girtman also treated Plaintiff and diagnosed him with schizoaffective disorder. As discussed above, he treated Plaintiff for at least two years, starting in 2013, and saw Plaintiff on a monthly basis, during which time he observed symptoms of auditory hallucinations and paranoia. In a Function Report, Dr. Girtman stated that Plaintiff had poor sleep, required reminders to take his medication and attend appointments, had difficulty getting along with others, had an extremely limited attention span (less than 5 minutes), did not finish what he started, had difficulty following instructions, and exhibited paranoia around people. ALJ Laverdure did not offer any reasons for rejecting Dr. Girtman's diagnosis or for declining to include in his RFC any limitations related to the symptoms described by Dr. Girtman. Because he was required to provide at least specific and legitimate reasons for rejecting these opinions, the ALJ committed legal error in weighing the evidence and his RFC is not supported by substantial evidence.

Finally, the ALJ offered no reason whatsoever for rejecting the opinions of the State agency doctors who reviewed the record and found that Plaintiff's schizophrenia was a severe impairment. The "reason" that ALJ Laverdure offered – that he gave "little weight" to the opinions of these doctors because he had reached a different conclusion than they had as to Plaintiff's diagnosis is not a reason at all. While the burden is not high when an ALJ rejects the opinion of a non-examining physician, the ALJ was at least required to cite specific evidence in

the medical record in support of his conclusion.  He did not do even that.

### B. Step Two Determination

#### 1. Legal Standards

The purpose of the Step Two inquiry—requiring that the claimant demonstrate that he has an impairment or combination of impairments that is severe—is to screen out groundless claims. *Smolen v. Chater,* 80 F.3d at 1290.  "An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  *Id.* (citations omitted).  Once a claimant prevails at step two, "regardless of which condition is found to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step *all* other alleged impairments and symptoms that may impact her ability to work."  *Angeli v. Astrue*, No. CIV S-06-2592 (EFB), 2008 WL 802334, at *3 (E.D. Cal. Mar. 25, 2008) (citing 42 U.S.C. § 423(d)(2)(B) (emphasis added)).  Thus, failure to find that an impairment is severe at step two does not necessarily constitute reversible error.  *Id.* "Rather, the question is whether the ALJ properly considered the functional limitations of all medically determinable impairments at the remaining steps."  *Id.* (citing *Smolen*, 80 F.3d at 1290) (holding that if one severe impairment exists, the ALJ must consider all medically determinable impairments in the subsequent steps of the sequential analysis) (citing 20 C.F.R. § 404.1523); *see also Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (holding that where the ALJ was alleged to have erred at step two by failing to find that one of claimant's alleged impairments was severe, it could only have prejudiced the claimant "in step three (listing impairment determination) or step five (RFC)"); *Nicholson v. Colvin*, 106 F. Supp. 3d 1190, 1195 (D. Or. 2015) ("[O]missions at step two are often harmless error if step two is decided in plaintiff's favor.").

#### 2. Discussion

The ALJ rejected outright Plaintiff's diagnosis of schizophrenia and therefore found that it was not a severe impairment at Step Two.  As discussed above, the ALJ's rejection of Plaintiff's schizophrenia diagnosis rests on the application of incorrect legal standards and improper weighing of the evidence in the record.  Moreover, the failure to include this impairment at Step Two resulted in prejudice to Plaintiff.  With respect to Plaintiff's application for disability

17

1 insurance benefits under Title II, the ALJ did not proceed beyond Step Two because of his
2 erroneous finding, resulting in denial of the application. As to Plaintiff's SSI application, the ALJ
3 did not address in his RFC many of the symptoms associated with this diagnosis that are described
4 by his treatment providers, including Plaintiff's difficulty maintaining attention and concentration
5 for extended periods, working in coordination or proximity to others without being distracted by them,
6 accepting instructions, responding appropriately to supervisors, and responding appropriately to
7 changes in the work setting. Therefore, the Court finds that the ALJ erred at Step Two and that the
8 error resulted in prejudice to Plaintiff.

### C. The ALJ's Reliance on the "Grids"

#### 1. Legal Standards

The Grids "present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114–15 (9th Cir. 2006) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999)). They consist of three tables, for sedentary work, light work, and medium work, and a claimant's place on the applicable table depends on a matrix of four factors: a claimant's age, education, previous work experience, and physical ability. *Id.* "For each combination of these factors, [the Grids] direct a finding of either 'disabled' or 'not disabled' based on the number of jobs in the national economy in that category of physical-exertional requirements." *Id.* However, "[t]he ALJ may rely on the grids alone to show the availability of jobs for the claimant 'only when the grids accurately and completely describe the claimant's abilities and limitations.'" *Tackett*, 180 F.3d at 1102 (quoting *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir.1985)). "When the grids do not completely describe the claimant's abilities and limitations, such as when the claimant has both exertional and nonexertional limitations . . . , the grids are inapplicable and the ALJ must take the testimony of a VE." *Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (citation omitted).

#### 2. Discussion

The ALJ included the following non-exertional limitations in his RFC: Plaintiff "is limited to performing non-public, simple repetitive tasks." AR 43. He nonetheless relied on the Grids to find that Plaintiff is not disabled, stating that "these [nonexertional] limitations have little or no

effect on the occupational base of unskilled work at all exertional levels." AR 47. The ALJ points to no evidence in support of this conclusory statement, which is not supported by substantial evidence. Rather, he should have taken testimony from the VE addressing how these limitations would affect the job base available for Plaintiff. Further, had the ALJ included nonexertional limitations associated with Plaintiff's schizophrenia, those limitation would also make reliance on the Grids inappropriate.

**D. Remedy**

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1177–78 (9th Cir. 2000). As a general rule, reversal of the Commissioner's decision results in remand for further proceedings, but a court may remand for award of benefits in "'rare circumstances,' . . . 'where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014) (quoting *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) and *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (internal quotation marks omitted)). A court may remand for award of benefits under the credit-as true rule if all of the following requirements are satisfied: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F.3d at 1178.

In this case, the ALJ failed to conduct a fulsome examination of the record and did not conduct a meaningful analysis at Steps Two, Step Three, Step Four or Step Five. Many questions remain regarding Plaintiff's limitations at the time of his alleged onset date and more recently and it is unclear if his limitations preclude him for working in either period of time, especially as there has been no testimony offered by a vocational expert. Therefore, the Court finds that it is appropriate to remand this case for further proceedings in which the Commissioner will determine whether Plaintiff is entitled to disability insurance benefits and/or SSI benefits.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, reverses the decision of the Commissioner and remands for further proceedings.

**IT IS SO ORDERED.**

Dated: September 24, 2019

JOSEPH C. SPERO
Chief Magistrate Judge